UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAMON BUNTING                                              CIVIL ACTION

VERSUS                                                     NO. 23-1712

ODYSSEA MARINE, INC.                                       SECTION M (4)

## ORDER & REASONS

Before the Court is a motion *in limine* to limit the testimony of plaintiff's proposed liability expert, G. Fred Liebkemann, IV, filed by defendant Odyssea Marine, Inc. ("Odyssea").[1] Plaintiff Damon Bunting responds in opposition,[2] and Odyssea replies in further support of its motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court grants the motion and excludes Liebkemann from testifying at trial.

**I.     BACKGROUND**

This matter concerns a maritime personal injury. In March 2018, Odyssea hired Bunting to work as a vessel captain.[4] Bunting worked on vessels for 30 years and was a licensed captain for 20 of those years.[5] In May 2021, Odyssea assigned Bunting to the *M/V Odyssea Titan* ("*Odyssea Titan*"), a 225-foot offshore supply vessel that is inspected and properly documented by the United States Coast Guard.[6]

On April 20, 2022, the *Odyssea Titan* departed from Fourchon, Louisiana, to conduct cargo operations at drilling platforms in the Gulf of Mexico.[7] During the voyage, Bunting and the first

---

[1] R. Doc. 20.
[2] R. Doc. 21.
[3] R. Doc. 23.
[4] R. Doc. 1 at 2.
[5] R. Docs. 20-1 at 2; 21 at 1.
[6] R. Docs. 1 at 2; 20-1 at 2.
[7] R. Doc. 21 at 1.

mate, Robert Weiss, alternated 12-hour watches, with Bunting being on duty from noon to midnight.[8] Around 9:00 a.m., on May 25, 2022, Bunting was off duty and sleeping when he was awakened upon being bounced up and down in his bunk as the vessel was conducting cargo operations.[9] Bunting went to the bridge to investigate why the vessel was "slamming" so heavily.[10] He discovered that Weiss, at the direction of the platform's crane operator, had positioned the vessel so that its stern was facing directly into the waves.[11]

On May 19, 2023, Bunting filed this case against Odyssea, alleging claims for Jones Act negligence, unseaworthiness, and negligence under general maritime law and state law, and seeking damages for injuries to his back, legs, knees, and feet.[12] Bunting retained Liebkemann as his liability expert.[13] Liebkemann, a licensed mechanical engineer, holds a bachelor's of science degree in mechanical engineering from the University of Miami (1986), and completed one-and-a-half years of post-graduate study in mechanical engineering at Louisiana State University.[14] He also has a certificate of achievement in automobile accident reconstruction.[15] His *curriculum vitae* lists several pieces of equipment he has designed, including cranes and other material handling equipment, oilfield equipment and structures, and certain kinds of vessels and marine components.[16]

In his April 8, 2024 report, Liebkemann discusses the facts of the incident that he gleaned from Bunting's deposition, specifically, that Bunting was thrown into the air while he slept because

---

[8] *Id.* at 1-2.
[9] R. Docs. 1 at 2-3; 20-1 at 2; 21 at 2.
[10] R. Doc. 21 at 2.
[11] *Id.*
[12] R. Doc. 1 at 1-7.
[13] R. Doc. 20-6 at 2.
[14] R. Doc. 20-7 at 1.
[15] *Id.*
[16] *Id.* at 2.

the vessel was slamming when floating high in the water with its stern facing the waves.[17]  Then, citing a study from 1970, Liebkemann explains the concept of vessel slamming, stating that it occurs when a vessel is lightly loaded and positioned with its stern facing rough waves.[18]  He opines that slamming can be alleviated by taking on seawater ballast in the vessel's aft tanks to lower the stern.[19]  But, citing Bunting's testimony, Liebkemann relates that Odyssea required its captains to ask permission to use seawater ballast, which was often denied.[20]  Liebkemann then reviews the vessel logs on tank loading and concludes that they are inadequate for calculating the amount and distribution of the ship's cargo for purposes of measuring the vessel's stability at the time of the incident.[21]  Regardless, Liebkemann concludes that the vessel was lightly loaded at the time of the incident.[22]  Liebkemann ends his report by stating six opinions:

>   1.  On account of its design, the *Odyssea Titan* experiences slamming when lightly loaded while station keeping in moderate following seas.
>
>   2.  The role of the vessel when attending the customer's platform involves station keeping per the customer's requirements.  These requirements often place constraints on both the position and the heading of the vessel.
>
>   3.  The ability of the vessel's master to correct the slamming issue by adding seawater ballast aft of the vessel's center of gravity is curtailed by the reservation of all suitably sized and located tanks for cargo.  Unwritten rules enforced by the owner's office staff effectively prevent the use of cargo tanks for seawater ballast.
>
>   4.  The conflict between the role of the vessel and the capabilities of the vessel is not addressed [in] the portions of the SMS document shared to date.  The Operations Manual for the *Odyssea Titan* has not been provided to date.
>
>   5.  Standing instructions to avoid headings that induce severe slamming of the stern while station keeping would have prevented the incident.

---

[17] R. Doc. 20-6 at 3.
[18] *Id.* at 4-6.
[19] *Id.* at 7.
[20] *Id.*
[21] *Id.* at 8-13.
[22] *Id.* at 13.

6. Captain Bunting was off duty and asleep in his bunk when he was injured. No action of his contributed to his injury.[23]

## II. PENDING MOTION

Odyssea moves to exclude or limit Liebkemann's proposed testimony from trial because his opinions do not relate to his area of expertise – mechanical engineering – but rather address vessel design and operations, topics about which he is unqualified to render expert opinions.[24] Odyssea points out that Liebkemann testified at his deposition that he has no education, training, or experience in vessel operations because, among other things, he holds no mariner's license, has never worked on a vessel in any capacity, has never supervised cargo operations on a vessel, and has not researched industry policy on seawater ballast.[25] Odyssea also contends that Liebkemann is unqualified to render the opinions set forth in his report because he is not a naval architect or marine engineer and has never been accepted by a court as an expert in either of those fields.[26] With respect to Liebkemann's specific opinions, Odyssea argues that Liebkemann parrots Bunting's testimony; Liebkemann's commentary on bottom slamming and his opinion regarding the vessel's design fall within the expertise of a naval architect, not a mechanical engineer; and Liebkemann improperly relies on an outdated and inapposite study to support his statements.[27] Also, Odyssea urges that Liebkemann's calculations on draft and weight should be excluded because they are incomplete and, thus, misleading and confusing.[28] As to Liebkemann's remining five opinions, Odyseea argues that they relate to vessel operations, a topic on which Liebkemann is unqualified to render opinions as he has no experience in that area.[29]

---

[23] *Id*. at 13-14.
[24] R. Doc. 20.
[25] R. Doc. 20-1 at 7-9.
[26] *Id.* at 9-11.
[27] *Id.* at 11-14, 15-17.
[28] *Id.* at 14-15.
[29] *Id.* at 17-22.

4

In opposition, Bunting argues that Liebkemann's qualifications as a mechanical engineer and experience as a crane operator are sufficient for him to give the proposed expert testimony.[30] Bunting also contends that Liebkemann has experience utilizing mechanical and marine engineering principles to design vessels, hulls of vessels, and vessel safety equipment that qualifies him to opine on the *Odyssea Titan*'s design.[31] Bunting indicates that, at a client's request, Liebkemann once took over a project for a certified marine architect.[32] Bunting claims that Liebkemann has sufficient knowledge of vessel slamming to render opinions on the subject and that he used the 1970 study in his report to show that the concept has long been recognized.[33] Also, Bunting contends that Liebkemann was able to determine that the vessel was lightly loaded at the time of the incident despite Odyssea's "poor/non-existent record-keeping."[34] As to Liebkemann's remaining five opinions, Bunting argues that Liebkemann's experience as a crane operator qualifies him to opine on vessel operations.[35]

In reply, Odyssea argues that Liebkemann's experience as a crane operator is irrelevant because this case is about *vessel* operations, not *crane* operations, and Liebkemann testified at his deposition that he has no experience operating vessels.[36] Odyssea also maintains that Bunting exaggerates Liebkemann's experience with vessel design.[37] Liebkemann testified at his deposition that he has never performed motion studies or stability calculations for an offshore supply vessel, and typically hires a naval architect to do that when necessary.[38] Odyssea contends that Liebkemann does not have "decades of experience in designing vessels [and] hulls of vessels," as

---

[30] R. Doc. 21 at 6-7.
[31] *Id.* at 7-11.
[32] *Id*. at 9, 12-14.
[33] *Id.* at 10-11.
[34] *Id.* at 11-12.
[35] *Id.* at 14-16.
[36] R. Doc. 23 at 1-5.
[37] *Id.* at 5-10.
[38] *Id.* at 5.

Bunting asserts, but was involved only in the hull design of two liftboats in the 1990s or 2001.[39] And those liftboats had movable legs or spuds, making Liebkemann's role more relevant since a mechanical engineer had to determine whether the hull could support the weight of the equipment.[40] Liebkemann testified at his deposition that he has never spearheaded the overall design of an offshore supply vessel.[41] Odyssea emphasizes that Liebkemann's "vessel design" experience involved designing machinery for vessels, not the vessels themselves.[42] Finally, argues Odyssea, Liebkemann cannot testify as to the forces applied to the vessel during the incident because he could not calculate the vessel's weight and draft.[43]

### III.  LAW & ANALYSIS

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[39] *Id.* at 6.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 8-9.
[43] *Id.* at 9-10.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. See *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id.* at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e.*, whether it is relevant. *Daubert*, 509 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed to an issue that is "well within the common sense understanding of jurors and requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make[] factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014).

Rule 702 also requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the district court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded in part by statute on other grounds as noted in Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020). A witness qualified as an expert is not strictly confined to his area or practice but may testify regarding related applications; a lack of specialization goes to the weight, not the admissibility of the opinion. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195-96 (5th Cir. 2018).

The facts, data, and sources used in an expert's opinion are generally considered by the jury in weighing the evidence, but "in some cases 'the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion.'" *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). As the gatekeeper, a district judge must "extract evidence tainted by farce or fiction. Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). "Generally, the fact-finder is entitled to hear an expert's testimony and decide whether the predicate facts on which the expert relied are accurate. At the same time, however, expert testimony that relies on completely unsubstantiated factual assertions is inadmissible." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (internal quotation marks, alterations, and citations omitted). Ultimately, the expert must "'bring to the jury more than the lawyers can offer in argument.'" *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

While nobody challenges Liebkemann's qualifications as a mechanical engineer, his report and deposition demonstrate that he is not qualified to render his proposed expert opinions because those opinions concern principles of naval architecture, marine engineering, and vessel operations or, more precisely, ship handling or vessel maneuvering. Thus, Liebkemann cannot offer any of his proposed opinions regarding the cause or effect of vessel slamming or any potential remedy, as they are untethered to his actual area of expertise, mechanical engineering. He has no education or experience in overall vessel design, nor did he perform any calculations demonstrating the forces at work on the *Odyssea Titan* at the time of the incident. Liebkemann's experience in designing vessel components and other equipment is not sufficient to render him an expert in the design and performance of an offshore supply vessel like the *Odyssea Titan*. Further, Liebkemann cannot offer any of his proposed opinions on vessel operations, such as station keeping, ballasting, the provisions of operations manuals addressing vessel capabilities, or standing instructions addressing ship handling, because he testified in his deposition that he has no experience in vessel operations, including particularly handling or maneuvering an offshore supply vessel. Although he may have some experience in crane operations, this case is about the operation and handling of a vessel, not a crane. Finally, Liebkemann's last opinion – *viz.*, that Bunting did not contribute to his injury – is a legal conclusion and does not fall within the province of an expert. As a whole, Liebkemann will bring no more to the jury than will be available through Bunting's testimony and lawyer argument. Due to Liebkemann's's lack of qualifications in the fields of naval architecture, marine engineering, and vessel operations, and because it is not more likely than not that his specialized knowledge will assist the trier of fact, his testimony is excluded from trial.

**IV.    CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that Odyssea's motion *in limine* to exclude Liebkemann's testimony at trial (R. Doc. 20) is GRANTED.

New Orleans, Louisiana, this 6th day of May, 2024.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE